1

2

3

4

5

6                            UNITED STATES DISTRICT COURT

7                            EASTERN DISTRICT OF CALIFORNIA

8

9

10

11    ERROL ALEXANDER JOSEPH                ) Case No.: 1:22-cv-00402-SKO (HC)
      BOWEN, JR.,                           )
12                                          ) ORDER DIRECTING CLERK OF COURT TO
                  Petitioner,               ) ASSIGN DISTRICT JUDGE
13                                          )
                                            ) FINDINGS AND RECOMMENDATION TO
14                                          ) CONSTRUE MOTION FOR SUMMARY
          v.                                ) JUDGMENT AS ANSWER TO PETITION, AND
15                                          ) TO DENY PETITION FOR WRIT OF HABEAS
                                            ) CORPUS
16    MERRICK GARLAND, et al.,              )
17                                          ) [THIRTY DAY DEADLINE]
                  Respondents.              )
18    _____       )

19

20          Petitioner has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  He

21    challenges his continued detention by the Bureau of Immigration and Customs Enforcement ("ICE").

22    He claims he should be immediately released because he has a valid claim to U.S. citizenship, and he

23    has been detained for longer than six months with no reasonable likelihood of removal in the

24    foreseeable future.  Respondent contends that Petitioner's detention is due to Petitioner's non-

25    compliance with ICE's removal efforts, and that his claim to U.S. citizenship is frivolous.  The Court

26    agrees with Respondent that Petitioner is not entitled to release.  For the reasons discussed below, the

27    Court will recommend that the petition be DENIED.

28

                                                    1

1     I.      BACKGROUND[1]

2          Petitioner is a native and citizen of Belize.  (Doc. 6-1 at 9, 14, 16-17.)  He was born in Belize

3     City, Belize, on December 19, 1979.  (Doc. 6-1 at 9, 14, 16-17.)  On an unknown date, he entered the

4     United States without inspection or admission.  On June 10, 2009, he was convicted in Los Angeles

5     County Superior Court of two counts of assault with a firearm, and one count of shooting at an

6     inhabited dwelling. (Doc. 6-1 at 24.)  He was sentenced to 16 years and 4 months in state prison.

7     (Doc. 6-1 at 24.)

8          On December 7, 2009, the Government initiated removal proceedings.  (Doc. 6-1 at 35-38.)

9     On February 3, 2010, an immigration judge ordered Petitioner to be removed to Belize.  (Doc. 6-1 at

10    40.) After serving his sentence, he was released into ICE custody.

11         On October 9, 2020, removal proceedings were reopened.  (Doc. 6-1 at 45.)  On December 23,

12    2020, at a removal proceeding hearing, Petitioner admitted to all charges of removability. (Doc. 6-1 at

13    49.)  However, Petitioner did not admit to being a citizen of Belize. (Doc. 6-1 at 49.)  The immigration

14    judge sustained the charge of inadmissibility and determined Belize was the country of removal.

15    (Doc. 6-1 at 49.)

16         On May 25, 2021, the Government submitted additional inadmissibility charges against

17    Petitioner. (Doc. 6-1 at 49.) On July 16, 2021, the immigration judge ordered Petitioner removed to

18    Belize. (Doc. 6-1 at 57.)  Petitioner did not appeal the decision.  The order of removal became final

19    and ICE began to effectuate Petitioner's removal. (Doc. 6-1 at 62.)  ICE thereafter obtained the

20    necessary travel documents from the government of Belize to return Petitioner to Belize.  (Doc. 6-1 at

21    79-80.)

22         On October 12, 2021, Petitioner was scheduled to depart the United States to Belize via

23    commercial flight. (Doc. 6-1 at 82.)  During transport to the airport, Petitioner became verbally

24    aggressive, kicked the door of the transport vehicle multiple times, and attempted to exit the vehicle.

25    (Doc. 6-1 at 5.)  Petitioner made threats to fight if the deportation officers placed him on the plane.

26    (Doc. 6-1 at 82.)  Based on Petitioner's statements and actions, and the potential risk to other

27

28    [1] This information is derived from the parties' pleadings and the exhibits submitted by Respondent.

1    passengers, ICE decided to postpone removal. (Doc. 6-1 at 5.)  On October 14, 2021, Petitioner was

2    provided a Notice of Failure to Comply Pursuant to 8 C.F.R. § 241.4(g). (Doc. 6-1 at 5.)  Petitioner

3    was advised that because he failed to comply with his obligation to assist in his removal and acted to

4    prevent removal, he would be detained until he cooperated with ICE's efforts to remove him.  (Doc. 6-

5    1 at 82.)

6          On November 12, 2021, December 14, 2021, January 12, 2022, February 7, 2022, March 8,

7    2022, April 4, 2022, and May 6, 2022, Petitioner was served additional notices for failing to comply

8    pursuant to 8 C.F.R. § 241.4(g). (Doc. 6-1 at 84-98.)  In each notice, Petitioner was read the

9    instructions regarding the requirement to assist in removal, which listed the things Petitioner is

10   required to complete in order to comply with his obligation to assist in the removal process, including

11   obtaining a travel document and the willingness to board an airplane as directed. (Doc. 6-1 at 84-98.)

12   Petitioner either failed to respond or stated he was not going to comply. (Doc. 6-1 at 84-98.)  In each

13   instance, the removal period was extended. (Doc. 6-1 at 84-98.)

14         On April 7, 2022, Petitioner filed a petition for writ of habeas corpus requesting release from

15   custody. (Doc. 1.)  On May 23, 2022, Respondent filed a response to the petition in the form of a

16   motion for summary judgment. (Doc. 6.)  On June 23, 2022, Petitioner filed an opposition to the

17   response. (Doc. 8.)  On June 30, 2022, Respondent filed a reply to Petitioner's opposition. (Doc. 9.)

18   **II.      DISCUSSION**

19         A.      Motion for Summary Judgment

20         Respondent has filed a motion for summary judgment. (Doc. 6.)  Summary judgment is a

21   procedural device available for prompt and expeditious disposition of controversy without trial when

22   there is no dispute as to material fact.  See Advisory Committee Notes, Fed.R.Civ.P. 56, 1963

23   Amendment ("The very mission of the summary judgment procedure is to pierce the pleadings and to

24   assess the proof in order to see whether there is a genuine need for trial.").  Its purpose is to prevent

25   the need for trial over facts that are not legitimately in dispute.

26         Petitioner has filed a petition for writ of habeas corpus.  "[T]he writ of habeas corpus is not a

27   proceeding in the original criminal prosecution but an independent civil suit." Riddle v. Dyche, 262

28   U.S. 333, 335-336 (1923); see also Keeney v. Tamayo-Reyes, 504 U.S. 1, 14 (1992) (O'Connor, J.,

1    dissenting).  Modern habeas corpus procedure has the same function as an ordinary appeal.  Anderson

2    v. Butler, 886 F.2d 111, 113 (5th Cir. 1989); O'Neal v. McAnnich, 513 U.S. 440, 442 (1995).  In a

3    habeas proceeding, the petitioner does not proceed to "trial."  Since the passage of AEDPA, a habeas

4    petitioner is rarely entitled to an evidentiary hearing.  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).

5    Whatever beneficial role summary judgment may have played in habeas proceedings prior to AEDPA

6    is now virtually non-existent.  For all practical purposes, summary judgment is equivalent to the

7    Court's making a determination on the merits of a habeas petition.  Thus, motions for summary

8    judgment are inappropriate in federal habeas proceedings. See, e.g., Atkins v. Montgomery, 2019 WL

9    10068937, at *1 (C.D. Cal. 2019); Kornfeld v. Puentes, 2019 WL 1004578, at *1 (E.D. Cal. 2019);

10   Johnson v. Siebel, 2015 WL 9664958, at *1 n.2 (C.D.Cal. Aug. 4, 2015); Mulder v. Baker, 2014 WL

11   4417748, at *1–*2 (D.Nev. Sept. 8, 2014); Gussner v. Gonzalez, 2013 WL 458250, at *3–*5

12   (N.D.Cal. Feb. 5, 2013).

13          For the above reasons, the Court will recommend the motion for summary judgment be

14   construed as an answer to the petition.

15          B.      Merits

16          Petitioner states he has been in continuous detention since approximately October 1, 2020, and

17   ICE has been unable to remove him to Belize.  He alleges he has a valid claim to U.S. citizenship

18   because he was born in the U.S. Virgin Islands.  He claims that he must be released because the six

19   month presumptively reasonable period of detention has passed, and there is no reasonable likelihood

20   of removal in the foreseeable future.  Zadvydas v. Davis, 533 U.S. 678, 699-700 (2001).  He contends

21   that he has reasonably cooperated with ICE's attempts to remove him, and he has attempted to obtain

22   travel documents to Belize.

23          1.      Post-Removal Detention Period

24          The removal period set forth in 8 U.S.C. § 1231(a)(1)(B) is 90 days from the date the order of

25   removal becomes administratively final, and the detention is governed by § 1231(a)(2).  The Attorney

26   General is required to remove the alien from the United States within this 90-day removal period.

27   Beyond the 90 days, ICE has the discretionary authority under § 1231(a)(6) to detain certain aliens or

28   to release them under an order of supervision.  Here, Petitioner has been detained beyond the 90-day

1    removal period.  He was taken into ICE custody on October 1, 2020, and his removal order became

2    final on July 16, 2021.  The parties do not dispute that Petitioner has been detained for approximately

3    eight months beyond the general 90-day removal period.

4           Continued detention beyond the removal period is governed by the Supreme Court decision in

5    Zadvydas v. Davis, 533 U.S. 671 (2001).  In Zadvydas, the Supreme Court adopted a presumptively

6    reasonable six-month period of detention.  Id.  Beyond that six month period, an alien is entitled to

7    relief if he "provides good reason to believe that there is no significant likelihood of removal in the

8    reasonably foreseeable future."  Id. at 701.  "And for detention to remain reasonable, as the period of

9    prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely

10   would have to shrink."  Id.

11          The Court finds that Petitioner has not met his burden of showing there is no significant

12   likelihood of removal in the reasonably foreseeable future.  As noted by Respondent, the only obstacle

13   to Petitioner's removal is his cooperation with ICE in obtaining a travel document and traveling to

14   Belize.  Petitioner was issued a travel document by the government of Belize on August 25, 2021.

15   (Doc. 6-1 at 79-80.)  ICE thereafter arranged to have Petitioner transported to Belize via commercial

16   flight on October 12, 2021. (Doc. 6-1 at 82.)  The parties do not dispute that Petitioner frustrated this

17   process by becoming belligerent and refusing to comply with ICE officers. (Doc. 1 at 5.)  When

18   Petitioner refused to comply, ICE officers returned him to detention. (Doc. 1 at 5.)

19                           a.      Fraud Perpetrated on the Court

20          Petitioner contends that the initial travel document issued by Belize was accomplished with a

21   fraudulent birth certificate. (Doc. 8 at 12.)  Petitioner contends that Respondent manufactured this

22   birth certificate.  However, as Respondent points out, Petitioner's mother submitted the "Certified

23   Copy of an Entry in a Register of Births for the District of Belize" (Birth Certificate) which reflects

24   Petitioner was born in Belize City, Belize. (Doc 6-1 at 13-14.)  The document was submitted by

25   Petitioner's mother in a June 8, 1995, Petition for Alien Relative, signed under penalty of perjury on

26   Petitioner's behalf with the U.S. Immigration and Naturalization Services. (Doc. 6-1 at 9-11.)  Thus,

27   the assertion that the document was fraudulently manufactured by Respondent is frivolous, and as

28   shown below, part of Petitioner's fraudulent scheme.

1        To contest the authenticity of the birth certificate, Petitioner has submitted a number of

2   documents, purportedly from various officials with the Belizean Government.  Respondent has shown

3   that these documents were fraudulently created in an attempt to perpetrate fraud on the Court.

4   Respondent states that in March 2022, shortly before the habeas petition was filed in this Court,

5   Petitioner and his father discussed a plan to fraudulently create fake documents through a

6   compromised Belizean government official.  (Doc. 9-1.)  The plan was discussed between Petitioner

7   and his father in recorded telephone calls at the McFarlane detention facility.  (Doc. 9-1 at 1-2.)  The

8   phone calls detailed Petitioner and his father's efforts in bribing officials in the Belizean Government

9   and obtaining fraudulent documents, which included: 1) A purported letter dated April 19, 2019, from

10  Vice Consul Carolyn Mckenzie of the Consulate General of Belize which states that a search of the

11  Vital Statistics database for birth entry of Petitioner was conducted, but no such entry could be located

12  (Doc. 8 at 28.); 2) A purported letter dated February 25, 2021, from Counsellor Michael Mena at the

13  Embassy of Belize, which states that a search of the Belize Passport System, Belize Birth Certificate

14  System, and Belize Nationality System revealed no record for Petitioner (Doc. 8 at 21.); and 3) A

15  letter from Mr. Raymond Usher, Commissioner of the Belize Supreme Court, which states that a

16  search for the existence of any entry of birth being registered in the Register of Births in the Belize

17  Vital Statistical Information for Petitioner's birth proved fruitless (Doc. 8 at 34.).  The descriptions of

18  the documents discussed in the phone calls match the documents Petitioner has submitted in his

19  opposition.

20       It is clear the documents were fraudulently created, and that Petitioner and his father

21  intentionally used them in an attempt to commit fraud upon the Court. They discussed certain

22  government officials involved, including the Commissioner of the Supreme Court -- "the one that

23  signs birth certificates" -- with whom Petitioner's father went to school. (Doc. 9-1 at 3.)  Petitioner's

24  father excitedly advised Petitioner that he had made a personal visit to the commissioner, the

25  commissioner was taking responsibility for the documents, and he had already paid him for it. (Doc. 9-

26  1 at 3.)  The phone calls detailed edits and revisions made by Petitioner's father to correct mistakes on

27  the documents.  For example, Petitioner's father noted that "Junior" was omitted from two of the

28  documents and he had to redo them.  (Doc. 9-1 at 3.) Another example is the "passport letter," which

1    Petitioner's father indicated had to be redone because "Alexander" was missing from Petitioner's

2    name, and the year of birth was mistakenly listed as 1980 rather than 1979. (Doc. 9-1 at 2.)  The

3    recorded conversations also revealed some of the bribes that were made including the amounts and

4    how they were to be used.  For example, on March 15, 2022, Petitioner called his father and his father

5    expressed anger that the final document was not yet finished and his contact was now requesting

6    payment of $200 for the document.  (Doc. 9-1 at 4.)  Petitioner's father stated he had to pay $50 to a

7    girl as a token to facilitate the papers and he had already paid $200. (Doc. 9-1 at 4.)  The two also

8    discussed where to mail the documents in an effort to avoid discovery.  For example, Petitioner

9    provided his mother's post office box address for receipt of documents. (Doc. 9-1 at 2.)  As noted by

10    Respondent, Petitioner's father was confident that the fraud would not be discovered.  In one phone

11    call, Petitioner's father told Petitioner, "I got your back," "You're clean, there's nothing for you here,"

12    and "I know the top man." (Doc. 9-1 at 3.)  In another call, Petitioner's father bragged that "even the

13    FBI cannot find anything." (Doc. 9-1 at 3.)

14      Petitioner and his father did not stop there with their fraudulent scheming.  According to the

15    phone calls, Petitioner and his father discussed obtaining additional licenses and identifications in the

16    United States by paying either $1,200 or $1,300 to a "hook-up at the DMV."  (Doc. 9-1 at 4-5.)

17      The mandatory removal period "shall be extended beyond a period of 90 days and the

18    [noncitizen] may remain in detention during such extended period if the [noncitizen] fails or refuses to

19    make timely application in good faith for travel or other documents necessary to the [noncitizen]'s

20    departure or conspires or acts to prevents the [noncitizen]'s removal subject to an order of removal." 8

21    U.S.C. § 1231(a)(1)(C).  Petitioner's attempt to perpetrate fraud upon the Court is cause enough to

22    deny the petition.  Under Rule 11 of the Federal Rules of Civil Procedure, the Court may impose an

23    appropriate sanction, including dismissal of the case, for fraudulent representations to the Court.

24    Separate and apart from Rule 11, a court has the inherent power to impose sanction on a party for

25    perpetrating a fraud on the Court.  Such sanctions "are warranted if it is 'established by clear and

26    convincing evidence that [a party] has sentiently set in motion some unconscionable scheme

27    calculated to interfere with the judicial system's ability impartially to adjudicate' the action.'" New

28    York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc., 432 Fed.Appx. 25, 25 (2d Cir.2011)

1    (quoting Scholastic, Inc. v. Stouffer, 221 F.Supp.2d 425, 439 (S.D.N.Y.2002)) (internal quotation

2    marks omitted).  That is clearly the case here, where Petitioner and his father have set in motion a

3    scheme to perpetrate fraud on the court.

4          In addition, Petitioner's repeated refusals to comply with ICE's efforts to obtain a travel

5    document and to willingly board a scheduled commercial flight to remove him permit ICE to continue

6    to detain Petitioner at its discretion pursuant to 8 U.S.C. § 1231(a)(6).  The "risk of indefinite

7    detention that motivated the Supreme Court's statutory interpretation in Zadvydas does not exist when

8    the [noncitizen] 'has the keys to freedom in his pocket and could likely effectuate his removal by

9    providing the information requested . . . .'" Lema v. I.N.S., 341 F.3d 853, 856 (9th Cir. 2003) (quoting

10   Pelich v. INS, 329 F.3d 1057, 1057 (9th Cir. 2003)).  To the contrary, "when a[] [noncitizen] refuses

11   to cooperate fully and honestly with officials to secure travel documents from a foreign government,

12   the [noncitizen] cannot meet his or her burden to show there is no significant likelihood of removal in

13   the foreseeable future." Id.  "8 U.S.C. § 1231(a)(1)(C) . . . authorizes the . . . continued detention of a

14   removable [noncitizen] so long as the [noncitizen] fails to cooperate fully and honestly with officials

15   to obtain travel documents." Id. at 857.  Accordingly, the Court finds that the petition should be

16   denied.  Because of Petitioner's non-compliance, he continues to be lawfully subject to mandatory

17   custody under 8 U.S.C. § 1231(a)(1)(C) without starting the clock in a new 90-day removal period.

18                            2.      Claim of U.S. Citizenship

19         Petitioner alleges he has a valid claim to U.S. citizenship because he was born in the U.S.

20   Virgin Islands.  Respondent correctly notes that the claim is frivolous, and another attempt to commit

21   fraud upon the Court.  Petitioner's documented immigration history which spans multiple decades

22   shows he was born in Belize City, Belize—not in the U.S. Virgin Islands.  As previously noted, on

23   June 8, 1995, Petitioner's mother submitted a Petition for Alien Relative, signed under penalty of

24   perjury, on Petitioner's behalf with the U.S. Immigration and Naturalization Services listing

25   Petitioner's place of birth as Belize City, Belize. (Doc. 6-1 at 9-11.)  Petitioner's mother submitted a

26   "Certified Copy of an Entry in a Register of Births for the District of Belize" (Birth Certificate) which

27   reflects Petitioner was born in Belize City, Belize. (Doc 6-1 at 13-14.)  In addition, on June 26, 2000,

28   Petitioner filed an Application to Register Permanent Residence or Adjust Status with the former

8

1 | Immigration and Naturalization Service. (Doc. 6-1 at 16-19.)  Petitioner signed the application under

2 | penalty of perjury and listed his place of birth as Belize City, Belize. (Doc. 6-1 at 16-19.)

3 |      Despite these records, Petitioner states he does not actually know where he was born, but

4 | claims he was born in the U.S. Virgin Islands "[o]n information."  The basis for his "information" is a

5 | copy of a rap sheet which purports to identify an "Errol Alexander Bowen" as being born in the U.S.

6 | Virgin Islands. (Doc. 1 at 16.)  As noted by Respondent, rap sheets often contain incorrect information

7 | because they are compiled from many sources: federal, state and municipal.  See U.S. Dept. of Justice

8 | v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 752 ("Because of the volume of rap sheets,

9 | they are sometimes incorrect or incomplete and sometimes contain information about other persons

10 | with similar names").  In fact, the copy of the rap sheet produced by Plaintiff includes a warning that

11 | the record is subject to "additions or deletions" that "may be made at any time."  (Doc. 1 at 16.)  The

12 | rap sheet also contains a disclaimer that information contained in the record can be changed, corrected

13 | or updated as set forth in 28 C.F.R. § 16.34.  (Doc. 1 at 16.)  Respondent also states he has

14 | investigated Petitioner's claim to being born in the U.S. Virgin Islands, but the Government of the

15 | U.S. Virgin Islands has advised no record of birth could be found under Petitioner's name. (Doc. 6-1

16 | at 42.)

17 |      In summary, Petitioner has made a fraudulent claim of U.S. citizenship, and it is clear that

18 | Petitioner was born in Belize City, Belize.

19 | **III.    ORDER**

20 |      The Clerk of Court is DIRECTED to assign a District Judge to the case.

21 | **IV.    RECOMMENDATION**

22 |      Accordingly, the Court HEREBY RECOMMENDS:

23 |     1) Respondent's motion for summary judgment (Doc. 6) be CONSTRUED as an answer to

24 |        the petition; and

25 |     2) The petition for writ of habeas corpus be DENIED WITH PREJUDICE.

26 |      This Findings and Recommendation is submitted to the United States District Court Judge

27 | assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

28 | Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30)

days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **July 8, 2022**                        /s/ Sheila K. Oberto
                                                    UNITED STATES MAGISTRATE JUDGE